## 77544. LEDBETTER et al. v. DELIGHT WHOLESALE COMPANY.
### (380 SE2d 736)

BENHAM, Judge.

As appellant Shala Ledbetter left an ice cream truck owned by appellee Delight Wholesale Company (Delight) and operated by defendant Kawan, she was struck and injured by a car driven by defendant Gray. Shala, through her parents, and her parents in their own right, filed a lawsuit against the above-named parties as well as others also allegedly responsible. This appeal was prompted by the grant of summary judgment to Delight.

Appellants alleged that Delight failed to train the ice cream truck driver adequately, and had provided the driver with a defective ice cream vending truck. Appellants also alleged that Delight was responsible under the theory of respondeat superior for the negligence of the driver. In its order granting summary judgment to Delight, the trial court ruled that Delight was relieved of liability under respondeat superior because the driver was an independent contractor, and that no genuine issue of material fact existed regarding the allegations of negligent training and negligent provision of a defectively designed truck.

1. The initial question for resolution is whether Delight, as defendant/movant for summary judgment, pierced the allegations of the complaint concerning respondeat superior and established as a matter of law that appellants could not recover under any theory fairly drawn from the pleadings and the evidence. See *Reed v. Adventist Health Systems &c.*, 181 Ga. App. 750 (2) (353 SE2d 523) (1987). Stated another way, did Delight establish that there was no genuine issue as to the material fact of its relationship with Kawan, and that it was entitled to a judgment as a matter of law because Kawan was an independent contractor? See OCGA § 9-11-56 (c).

"An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer." OCGA § 51-2-4. " 'In determining whether the relationship of parties under a contract for performance of labor is that of employer and servant or that of employer and independent contractor, the chief test lies in whether the contract gives, or the employer assumes, the right to control the time, manner and method of executing the work as distinguished from the right merely to require certain definite results in conformity to the contract.' [Cit.]" *McGuire v. Ford Motor &c. Corp.*, 162 Ga. App. 312, 313 (290 SE2d 487) (1982).

Attached to Kawan's deposition is the "License and Lease Agreement" he entered into with Delight two days before Shala was injured. It described Delight as "a corporation engaged in the wholesale ice cream novelties business" and Kawan as one "in the retail business of street vending ice cream products . . . [who] desire[d] to purchase ice cream novelties from [Delight] for resale. . . ." Through the agreement, Delight licensed Kawan as a street vending retailer entitled to sell Delight's ice cream novelties. Delight agreed to sell the ice cream novelties at wholesale prices to Kawan for resale at prices Kawan established. As part of the agreement, Delight leased an ice cream street vending vehicle to Kawan. The truck was emblazoned with the name "Circus Delight," a name associated with Delight, and Delight's "Safety Clown." Delight agreed to maintain, repair, and replace the vehicle and undertook to arrange for personal and property liability insurance coverage, to be paid for by Kawan. Kawan also agreed that part of his rental fee would be used to purchase personal accident insurance coverage through the Retail Ice Cream Vendors Insurance Group. The only two paragraphs of the license and lease agreements in boldface stated that the agreement "SHALL NOT BE CONSTRUED AS CONSTITUTING [KAWAN] AN AGENT . . . SERVANT, EMPLOYEE . . . OF [DELIGHT] FOR ANY PURPOSE WHATSOEVER . . . [;] [THAT KAWAN] SHALL BE FOR ALL PURPOSES AN INDEPENDENT CONTRACTOR AND COVENANTS AND AGREES TO OPERATE HIS BUSINESS AS AN

INDEPENDENT CONTRACTOR. . . . [DELIGHT] WILL NOT EXERCISE CONTROL OVER THE MANNER IN WHICH SUCH ICE CREAM PRODUCTS AND CONFECTIONS ARE SOLD OR OTHER SUCH DETAILS OF [KAWAN'S] METHODS OF OPERATION, WHICH SHALL BE WITHIN THE CONTROL AND RESPONSIBILITY OF [KAWAN]. . . . IT IS UNDERSTOOD AND AGREED THAT [KAWAN] WILL NOT BE TREATED AS AN EMPLOYEE . . . FOR FEDERAL TAX PURPOSES, STATE TAXES, OR ANY OTHER PURPOSES."

" 'Where the contract of employment clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the employer assumed such control. [Cit.]' " *McGuire v. Ford Motor &c.*, supra. Other evidence in the record leads us to conclude that the issue is not as clear-cut as the trial court saw it.

A booklet entitled "Delight Wholesale Company presents How to Operate Your Own Ice Cream Vending Business" was identified by Delight's branch manager as containing "Delight Wholesale Company's position as to the proper procedure for instructing an operator to run an ice cream business." Reading the booklet by potential vendors was optional inasmuch as a Delight safety videotape, the viewing of which was mandatory, "basically covers the same points."

The booklet reminded the reader that he/she would be operating the business as an independent contractor and contained "suggested operating and safety procedures that we have prepared based upon reported techniques and procedures of [successful Delight vendors]." The booklet instructed the operator to wash, clean, and check mechanically the vehicle on a daily basis; never speed or violate traffic regulations; never vend on highways or main thoroughfares or where the speed limit exceeded 30 miles per hour; never vend in heavy traffic; not to tailgate; slow down in intersections; always give the other driver the right-of-way; and never drink or use a controlled substance while operating as a vendor. Vendors were told to always activate the swing-out "SLOW" or "STOP" sign when making a sale; to always have flashers on when vending; to never make sales from the street side of the vehicle, but only from the curb side; to practice "Stop and Wait" selling, i.e., that the vendor will stop and wait for children to avoid having children dart into the street; to not give small children ice cream until the vendor has seen that the street is clear of traffic; to not allow passengers; and to not wear head phones or play a radio loudly. The booklet suggested that vendors be neat and clean at all times; to always wear a shirt and shoes, and to not wear T-shirts or hats with offensive messages. The booklet told the vendor that a geographic sales territory would be suggested to the vendor, but that how and when the territory was worked was up to the vendor. It suggested

a complete day of operation (10 a.m. until after dark), and warned against neglecting deadend streets or commercial areas. The booklet also instructed the vendor how to handle customer complaints, and to report them as well as any accidents to the district manager. The booklet closed with a letter from Delight's vice-president stating that correct use of the booklet greatly enhanced the vendor's chances of success, and that all members of the Delight management team had previously been vendors.

Delight's branch manager, McCarty, testified on deposition that the booklet presented Delight's position as to the proper procedure for instructing an operator how to run an ice cream business; that each vendor received a territory and Delight "liked for them to stay in boundaries," that ice cream could be picked up daily by vendors only between 8:00 a.m. - 1:00 p.m.; that the district manager checked the truck every day; and that the ice cream vending trucks had to be returned to Delight's each night by one-half hour after dark. He stated that if complaints were received about a vendor, his lease (and licensing agreement) was cancelled if management could not solve the problem; if a vendor was habitually late in his daily return of the vending truck, his lease would probably be terminated; if a vendor complained of another vendor selling in his territory, the management intervened to resolve the problem. Delight management annually conducted approximately ten safety meetings with its vendors. While attendance was not mandatory, management would tell those vendors who could not attend what had been discussed.

Kawan, the vendor involved in the accident, testified on deposition that his initial contact with Delight occurred on April 17, 1985, when he responded to a "help wanted" sign. Kawan, an Iraqi student studying in the United States, and for whom English appeared to be difficult, characterized his actions as "applying for a regular job, just a job." He viewed a videotape on safety and selling ice cream and read a brochure. He believed that, should a mistake occur due to his failure to follow the instructions given on the videotape, he "would pay for it." Kawan testified that his ice cream vending career lasted two days, ending the evening Shala was struck. During his two-day relationship with Delight, he chose to work until sunset; he determined the amount of ice cream he procured from Delight; and he was not told to go to a specific area. He did, however, report back to Delight at the end of both days. He did not wear distinctive Delight clothing or a badge that identified him as a Delight employee.

In light of the evidence concerning the exercise by Delight of control over the time, method, and manner of work of the vendors, we cannot say, as a matter of law, that Delight carried its burden on motion for summary judgment. *McGuire v. Ford Motor &c. Corp.*, supra; *American &c. Life Ins. Co. v. Gray*, 89 Ga. App. 672 (80 SE2d 832)

(1954). Compare *Allison v. Nat. Assn. for Self-Employed*, 187 Ga. App. 592 (1) (370 SE2d 841) (1988). Delight restricted the hours of sale by having the product available for pickup during a limited time and by requiring nightly return of the vending trucks; and restricted the manner and method of work through contractual termination should the vendor cause unresolved customer complaints or habitually fail to return his vehicle daily. The mandatorily-written "suggestions" also were a means to control a vendor's method and manner of work since the customer complaints that would arise due to a vendor's failure to follow the "suggestions" would, in all likelihood, result in contractual termination should the vendor not agree to conduct business according to the "suggestions." We are, therefore, compelled to reverse the grant of summary judgment to Delight that was based upon the trial court's determination that Kawan was an independent contractor for whose negligence Delight was not responsible.

2. Appellants also take issue with the trial court's conclusion that summary judgment on the allegation of negligent training was appropriate for appellee. Appellants' complaint alleged that Delight was "negligent in giving improper, inadequate or misleading instructions and training to . . . Kawan, or giving no training at all, with regard to the fact that . . . [the] swing-out stop sign [attached to the driver's side of the ice cream vending truck] would return to a closed position when the engine was cut off, thereby failing to continue to give warning to oncoming traffic." Gray, the driver whose pickup truck struck Shala, testified on deposition that no stop sign was extended from the truck and that she decided to pass the ice cream truck after she had ascertained that the children's feet she had spotted on the curb side of the truck "didn't move." Had the ice cream truck had an extended stop sign, she testified, she would have remained stopped until the sign had been retracted.

Delight's branch manager testified that Kawan was supplied with an ice cream truck that had a stop sign that swung out from the driver's side of the truck. Kawan testified that he pulled the knob that activated the stop sign and later turned the truck engine off when he realized he would be at the location for a while. He later learned that turning the engine off caused the stop sign to retract, despite the fact that he had pulled out the activating knob. Kawan testified that someone from Delight had shown him how to activate the swing-out stop sign, but he was not able to recall whether he had been instructed about the effect turning the engine off had on the activated sign. After the accident, through experimentation, Kawan came to the realization that cutting the engine off deactivated the swing-out sign.

While he could not recall giving Kawan the safety orientation, Delight's district manager admitted that his duties on April 17, the

day Kawan saw the video and read the booklet, included responsibility for conducting the safety activities. He stated there was "no standard procedure" for explaining the swing-out arm's dependency on a running engine, and that it was "usually mentioned," but he could not say whether the operation was explained to Kawan. Only four or five trucks in Delight's fleet of twenty had this type of swing-out arm. The remainder had arms that could be activated even if the engine were cut off.

Delight maintains that Kawan was aware of the mechanics of the swing-out sign, and bases its position on a response Kawan made to a complex, compound question. When asked "Did anybody from Delight say to you that it was more important to leave that engine running so that the swing-arm would stay out than it is to worry about how much gas you use?" Kawan, whose lack of skill in the English language was demonstrated time and again throughout the deposition, replied that someone at Delight had told him. This testimony, if taken to be an admission that someone at Delight had told him that cutting off the engine would cause the sign to retract, is directly at odds with the rest of Kawan's testimony concerning his limited knowledge of the arm's operation, and his discovery through experimentation of the arm's dependency on a running engine. However, because it was never determined whether the Delight employee told him this information before or after the accident, it cannot be used as an unexplained contradiction and construed against Kawan (and thereby against appellants). See *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (2) (343 SE2d 680) (1986). Therefore, there exists a question of fact concerning whether Delight management gave Kawan complete instructions concerning the operation of the swing-out stop sign. Summary judgment for Delight was not appropriate in light of the existence of a genuine issue of material fact. OCGA § 9-11-56.

3. Lastly, the trial court granted summary judgment to Delight on the ground that no genuine issue of material fact existed as to appellants' allegation that Delight had been negligent in providing Kawan with a defectively designed truck, that being one in which the swing-out stop sign could not be used if the truck engine were off.

Appellee, as lessor of the truck, had a duty "[t]o warrant . . . that the thing bailed is free from any secret fault rendering it unfit for the purposes for which it is hired." OCGA § 44-12-63 (3). According to the evidence adduced, the inability to use the swing-out arm if the engine were off "neither rendered the [truck] unusable nor rendered the [truck] inherently unsafe for any use." *Fortner v. W. C. Cayne & Co.*, 184 Ga. App. 187 (2) (360 SE2d 920) (1987). The truck was "not rendered 'defective' by the patent absence of a specific safety device which would serve to guard against a common danger connected with the limited use of [the truck, selling ice cream with

the engine off], which danger the ultimate user can himself recognize and otherwise guard against. [Cits.]" Id. at 191. The trial court did not err in granting summary judgment to appellee concerning the allegation that appellee negligently leased a defectively designed truck to Kawan.

*Judgment affirmed in part and reversed in part. McMurray, P. J., and Pope, J., concur.*

DECIDED MARCH 10, 1989 —
REHEARING DENIED MARCH 28, 1989 —

*Hill & Bleiberg, Robert P. Bleiberg,* for appellants.
*Greene, Buckley, DeRieux & Jones, Gregory J. Digel, Margaret L. Milroy,* for appellee.